# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-00733-COA

**MARGARET DENISE WADE**                                                    **APPELLANT**

**v.**

**SIMMONS EROSION CONTROL, INC.**                                          **APPELLEE**

DATE OF JUDGMENT:                   06/27/2023
TRIAL JUDGE:                        HON. ROBERT GEORGE CLARK III
COURT FROM WHICH APPEALED:          MADISON COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:             ROBERT O. WALLER
ATTORNEYS FOR APPELLEE:             SAMUEL C. KELLY
                                    WILLIAM DEMENT DRINKWATER
NATURE OF THE CASE:                 CIVIL - REAL PROPERTY
DISPOSITION:                        AFFIRMED - 07/16/2024
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., McCARTY AND EMFINGER, JJ.**

**McCARTY, J., FOR THE COURT:**

¶1.     Two property owners sought to divide more than 600 acres of land appraised for over

four million dollars in Madison County, Mississippi. A special master presented two potential

ways to split the acreage. While the two options were not identical, both resulted in the

parties getting a section of property proportionate to their ownership rights. The chancery

court selected the first option. One of the landowners now appeals. Finding no error, we

affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.     The property here is approximately 632.74 acres and borders a frontage road to the

north, called Virillia Road, and a creek to the east, called Hanging Moss Creek.[1] Initially, the disputed property was owned entirely by the Hardy family (Margaret Wade's grandfather, father, and uncle) and had been leased for farming and recreational purposes for several decades. This use included an "exclusive hunting lease" to Chris Simmons, acting through his company 10 Point Hunting Club.[2]

¶3.     Wade and her two siblings inherited the entire property in April 2019 jointly, as tenants in common. Then in August 2020, Wade's two siblings chose to sell their shares of ownership, but Wade opted not to sell hers. Her siblings sold their combined two-thirds ownership to Simmons Erosion Control. As a result, Wade and Simmons Erosion became cotenants, with Wade owning a one-third share of the property in its entirety and the company owning a two-thirds share.

¶4.     Wade and Simmons Erosion disagreed on how to use the land after the sale. Wade wanted to lease it to a third party for farming, but the company did not want to lease it out. Simmons Erosion wanted to use the land themselves for hunting, as the Simmonses had been under the exclusive hunting lease since 2010. The parties eventually came to an impasse around December 2020, so Wade took legal action. She filed a complaint in the Madison County Chancery Court requesting the court divide the disputed property, and Simmons

[1] The southern border adjoins property owned by Chris Simmons and Jennie Simmons, both affiliated with Simmons Erosion Control, Inc. The record indicates Jennie is the sole owner of the company, and Chris is an officer.

[2] Chris began leasing the property for exclusive hunting rights in 2010. His exclusive hunting lease was continuously extended until sometime in 2020.

Erosion filed a response agreeing with the requested partition in kind.[3]

¶5.    The chancery court appointed John Evans, a commercial real estate appraiser, as special master. As special master, it was Evans' role to determine whether the land could be partitioned in kind, and if so, to prepare a report recommending an equitable partition.[4] Evans submitted his partition report to Wade and Simmons Erosion on November 12, 2021.[5] The report contained an appraisal of the property and two proposed options for partitioning the property.

¶6.    The special master's report appraised the value of the subject property without partition at $4,750,000, or $7,500 per acre. But the report stated that according to the

---

[3] In January 2021, before the court had an opportunity to hear or rule on the complaint for partition, Wade sought to execute the renewal of an agricultural lease agreement, which would lease 487 acres of the jointly owned property to a third-party for farming purposes. Simmons Erosion opposed the execution of this lease, arguing the farming lease would interfere with its post-partition share of property. Wade claimed that she would lose profits if the farming lease was not renewed. The chancery court granted a restraining order prohibiting Wade from leasing the property.

[4] The original appointed land commissioner passed away before the completion of the partition report. As a result, the court substituted a new appointed land commissioner, Evans.

[5] The sequence of events that ultimately resulted in the parties receiving the special master's report is unclear from the record presented to this Court. Both parties simply assert in their respective briefs that they received Evans' report on November 12, 2021. The docket does not contain an entry indicating that the report was officially filed with the chancery court on that date. The docket shows a court order appointing Evans was entered on September 7, 2021, and a court order for the parties to deposit money was entered on October 4, 2021. Then the next docket entry was a letter filed by Wade on December 3, 2021, "in Response to Appraiser John Evans['] recommendations." The record does not show whether the special master sent a copy to the chancery court.

3

principles of highest and best use of land, additional value could be added if the acreage was separated into three specifically outlined tracts.[6] Tract A is an 11.81-acre tract in the northwest corner, tract B is a 36.85-acre tract in the northeast corner, and tract C is a 584.08-acre tract at the center of the property. The report stated that tract A was valued at $15,000 per acre; tract B was valued at $10,000 per acre; and tract C was valued at $7,500 per acre. The approximate total value for the 11.81 acres in tract A was $177,150; the 36.85 acres in tract B was $368,500; and the 584.08 acres in tract C was $4,380,600. Altogether, the special master valued the property at $4,926,260 if the acreage was separated as described.

¶7.     The report further found that the acreage along Virillia Road frontage and the acreage on the eastern boundary was prime hunting land. The special master noted that both parties wanted ownership of these particular areas. Based on these findings, the report proposed two options to partition the land.

¶8.     Option 1 provided Wade with the 11.81 acres in tract A and the 36.85 acres in tract B, as well as a tract of approximately 144 acres on the western side of the property.[7] In total, Wade would receive approximately 192.66 acres valued at $1,625,650, which equated to 33% of the total appraised value ($4,960,260). Wade would be allocated 52% of the frontage road acreage and approximately one-third of the desired eastern boundary.

_____

[6] For the purposes of clarity, we refer to the three specifically outlined and described sections of land as tract A, tract B, and tract C.

[7] The proposed 144-acre tract was a long narrow section that stretched from the northern frontage road down to the southern property line.

4

¶9.     Option 1 provided Simmons Erosion one contiguous parcel of approximately 440.08 acres valued at $3,300,600, which equated to 67% of the total appraised value. The company would be allocated approximately two-thirds of the property on the eastern boundary but less than half of the frontage road acreage. Additionally, the property Simmons Erosion would receive contained a $45,000 bridge it previously built at its own expense, plus receive access to food plots and shoot houses it also constructed.

¶10.    Option 2 would provide Wade with the 11.81 acres in tract A and the 36.85 acres in tract B, as well as an approximately 186-acre tract in the northeastern corner by Hanging Moss Creek. In total, Wade would receive approximately 197.81 acres valued at $1,664,275, which equated to 33.78% of the total appraised value. Under Option 2, Wade would be allocated approximately 62% of the frontage road acreage and more than 50% of the eastern border acreage. This option would also give Wade property containing at least two food plots and two shooting houses that Simmons Erosion had constructed on the property.

¶11.    Option 2 provided Simmons Erosion with one "L-shaped" parcel consisting of approximately 434.93 acres valued at $3,261,975, which equated to 66.22% of the total appraised value. Simmons Erosion would be allocated less than 50% of the frontage road acreage and less than 50% of the eastern border acreage. Additionally, the company would receive property containing the $45,000 bridge it constructed, but it would be deprived of the fields that the bridge was installed to access.

¶12.    On December 3, 2021, Wade filed a letter with the chancery court requesting it adopt

Option 2. Simmons Erosion then filed a motion for judgment of partition and for the court to adopt Option 1, order a survey to determine the legal boundaries, and award owelty[8] for any differences in the values of the shares. Simmons Erosion attached the special master's report to its motion. In response, Wade filed a motion for a judgment of partition, arguing that Option 2 "most equitably divides the property while providing Wade a mostly contiguous parcel and Simmons Erosion a full out contiguous parcel" with the adjoining land the Simmonses personally owned already.

¶13.    The chancery court conducted a hearing on the dueling motions for partition and heard testimony from John Evans, Jennie Simmons, Phill Wade, and Margaret Wade.[9] The chancery court entered a judgment of partition on November 16, 2022, concluding that the special master's report and recommendations were "accepted and approved" and not manifestly wrong, finding Option 1 recommended by the special master as more equitable and ordering a partition of the property as set forth in Option 1. Wade subsequently filed a motion to reconsider or, in the alternative, for a new trial, which the chancery court denied. Aggrieved, she appeals.

_____

[8] Owelty means "equaliz[ing] respective shares by payments of money." 7 Jeffrey Jackson et al., *Authority of Court*, Encyclopedia of Mississippi Law § 60:100 (3d ed. updated Apr. 2024) (citing Miss. Code Ann. § 11-21-33). "The payment of money is referred to as owelty. It is a first lien upon the share of the party charged to pay owelty." *Id*.

[9] While the court's ruling was pending, Simmons Erosion filed a post-hearing motion renewing its request for a judgment partitioning the property according to Option 1. On the same day, Wade filed a memorandum of facts in support of Option 2, repeating the reasons she believed that Option 2 was a better option and also alleging that Option 1 was biased against her.

**DISCUSSION**

¶14.   "'Partition is a statutory right in Mississippi' governed by Mississippi Code Annotated sections 11-21-1 through [11-21]-45 (Rev. 2004)." *Kohnke v. Tate*, 270 So. 3d 1076, 1081 (¶8) (Miss. Ct. App. 2018) (quoting *Mosby v. Mosby*, 962 So. 2d 119, 121 (¶8) (Miss. Ct. App. 2007)).[10] "The term 'partition' refers to the division of property held by two or more people jointly or in common into individually owned parcels." K. F. Boackle, *Partition*, Mississippi Real Estate Contracts and Closings § 5:22 (2d ed.). Ownership interest and "the right of possession[] in the tenants in common gives an absolute and unconditional right to partition *however inconvenient it may be to make*." *Land v. Land*, 334 So. 3d 1245, 1247 (¶8) (Miss. Ct. App. 2022) (emphasis added) (citing *Mosby*, 962 So. 2d at 122 (¶8)). "Any party in interest . . . may institute proceedings for the partition of lands . . . in the chancery court." *Kohnke*, 270 So. 3d at 1081 (¶8) (quoting Miss. Code Ann. § 11-21-5 (Rev. 2004)). The chancery "court may effect a partition by equal in kind division of the property, or by a sale of the property and division of the proceeds." *Mobley v. Mobley*, 827 So. 2d 714, 717 (¶13) (Miss. Ct. App. 2002). "Partition in kind is the preferred method of partitioning property in Mississippi." *Sims v. Mattis*, 192 So. 3d 1109, 1111 (¶9) (Miss. Ct. App. 2016).

¶15.   Because partitioning land can be complex, "Mississippi judges have long had the power to appoint masters, referees, and commissioners as assistants to the court." *Brewer*

---

[10] "Property-partition cases are generally governed by Mississippi Code Annotated sections 11-21-1 through [11-21]-45 (Rev. 2004)." *Sims v. Mathis*, 192 So. 3d 1109, 1111 (¶9) (Miss. Ct. App. 2016).

*Const. Co. v. David Brewer Inc.*, 940 So. 2d 921, 925 (¶18) (Miss. 2006) (quoting MRCP 53 cmt.). Appointment and duties are now set by rules. *See* MRCP 53. Typically, a parcel is partitioned in kind "as the special commissioners may think proper, having regard to the situation, quantity, quality and advantages of each part or share, *so that they may be equal in value as nearly as may be, or according to the respective rights of the parties.*" *In re Last Will & Testament of Lynn*, 878 So. 2d 1052, 1056 (¶17) (Miss. Ct. App. 2004) (emphasis added) (quoting Miss. Code Ann. § 11-21-[19]).

¶16.    Accordingly, our "standard of review for property partition cases is whether this Court finds manifest error in the decision of the chancellor[.]" *Id.* at 1055 (¶11). And the "chancellor [has] wide discretion in determining whether to confirm the special commissioner's report." *Miles v. Miles*, 949 So. 2d 774, 781 (¶24) (Miss. Ct. App. 2006).

¶17.    Wade generally challenges the chancery court's adoption of Option 1 proposed by the special master. To some extent, she claims she was "blindsided" by the special master's endorsement of Option 1 as "more equitable" during the hearing on the merits. In light of our standard of review, the question before this Court is whether the chancery court's decision to adopt partition Option 1 proposed in the report was manifest error. Based on our review of the record on appeal, we cannot find that the chancery court's determination that Option 1 was an equitable partition of the subject property was manifest error.

¶18.    The chancery court's judgment of partition adopted the special master's findings and selected Option 1 as the manner of partition. The court based its decision, in part, on the

special master's testimony opining that Option 1 "most equitably allocates Virillia Road frontage[,] the acreage along the eastern boundary preferred by both parties," and is "the fairest option because it . . . protects the improvements made by Simmons on the subject property." The order also weighed that "[t]he special master explained in his partition report, Option #1 most closely equalized the values of the parties' respective shares, therefore, minimizes the need for owelty."

¶19.    Notably, the court's order explicitly considered each parties' respective arguments at the partition hearing, including Wade's arguments advocating for a modified version of Option 2. The court noted Wade asserted "that Option 1 is a long narrow strip of land;" "is comprised of two parcels . . . over one half mile away;" is "not attractive for deer hunting;" "Simmons Lake and Lake house are located and contiguous with the land directly below this parcel;" and "Simmons own outright 1,028 acres adjoining the southern" side. Furthermore, the order stated that Wade insisted Option 2 "at least puts a greater percentage of [her] allotted one[-]third in one contiguous parcel," and "property lines from the proposed plans could be altered slightly which would alleviate that small difference [of 1%] in Option 2." The court found that Wade ultimately was arguing that "adopting Option 2 is the most equitable of the two options as it allows Wade to have the preponderance of her land in one parcel and the Simmons [will] have their entire acreage in one undivided parcel."

¶20.    Critically, the special master's report contained a "reconciliation and final opinions" section which said, "The two partition options have resulted in essentially, the same

9

indications of the value of the 2/3rds interest and the 1/3rd interest, being only about 1% different."

¶21.    Wade had a one-third or 33% interest in the subject property, and Simmons Erosion had a two-thirds or 67% interest. Option 1 allocated a portion of acreage to Wade appraised at a value equal to 33% of the total value of the property and allocated a portion of acreage to Simmons Erosion that appraised at a value equal to 67% of the total value. Option 1 proposed a partition that gave Wade and Simmons Erosion a share of the property equal to their respective ownership interests of 33% and 67%. On the other hand, under Option 2, Wade would receive property equal to 33.78% of the total value, and Simmons Erosion would receive property equal to 66.22% of the total value. Option 2 would provide Wade more than her respective interest and Simmons Erosion less than its respective interest.

¶22.    Both parties repeatedly testified each specifically desired the acreage along the frontage road and the acreage on the eastern boundary. Under Option 1, the frontage road acreage was split with 52% going to Wade and 48% going to Simmons Erosion, whereas Option 2 would divide frontage road with 62% going to Wade and 38% going to Simmons Erosion. Option 2 would result in Wade receiving double her 33% interest and Simmons Erosion receiving half of its 67% interest. While neither option split the frontage road acreage exactly equal to the parties' respective shares, Option 1 nudged closer to the correct proportionate share.

¶23.    Additionally, Option 1 provided Wade approximately one-third and Simmons Erosion

10

approximately two-thirds of the eastern boundary acreage. Conversely, Option 2 would give Wade more than half of the acreage along the eastern boundary, while Simmons Erosion would get less than half. Option 1 divided the eastern boundary acreage in a manner equal to the parties' respective ownership interests.

¶24. Furthermore, under Option 1, Simmons Erosion received the bridge it had constructed at its own expense as well as the benefit of the bridge because the fields the bridge was intended to provide access to were also given to Simmons Erosion. The property allocated to Wade in Option 2, however, would encompass the fields that the bridge was constructed to access and would nullify the purpose.

¶25. Our precedent is clear that a chancery court "may adopt the [special master's] report or modify it or may reject it in whole or in part, or may receive further evidence or may recommit the report with instructions." *Massey v. Massey*, 475 So. 2d 802, 805 (Miss. 1985). Given the nearly identical valuation of Option 1 and Option 2, and the details considered in the division of acreage in Option 1, we cannot say it was manifest error for the chancery court to select Option 1 as the method of partition.

¶26. We reached a similar conclusion in *Miles*, where we emphasized the importance of the procedure by which the special master is selected and the report is presented to the chancery court. *Miles*, 949 So. 2d at 779 (¶18). In *Miles*, two siblings sought a partition of property they jointly owned with their brother. *Id.* at 777 (¶9). Opposed to one method of partition, the two siblings "simply objected to the special commissioners' recommendations

11

and suggested alternative partition methods commensurate with their position." *Id.* at 779-80 (¶18). While not raised as formal objections per the rule, the chancery court considered them but ultimately selected the method proposed by the commissioners' report. *Id.* at 780 (¶18). We found the chancery court did not abuse its "wide discretion" in adopting the approach proposed by the special commissioners. *Id.*

¶27. The same is true here. While Wade focuses her arguments on why she prefers Option 2, she does not and cannot point to any part of the record that shows why the approach of Option 1 constitutes manifest error. Absent such a showing, we will defer to the chancery court's findings.

¶28. Wade's appeal also appears to raise a claim that she "did not know that the Special Master had one preferred recommendation out of the two (2) options until the final hearing" and did not have an opportunity to object. The special master's report was distributed to the parties in November 2021 and contained information detailing the two options proposed to the court for partitioning the subject property. The chancery court conducted a hearing on the partition matter before making its ruling. A period of nine months then passed between the hearing and the day the court entered its judgment. While Wade claims she was "blindsided," it is clear from this record that she was given ample opportunity to dispute whether Option 1 or Option 2 was the best, equitable route.

¶29. On appeal, Simmons strains to argue Wade is procedurally barred as she did not object within ten days pursuant to Mississippi Rule of Civil Procedure 53(g). Rule 53(g)(1) states,

The master shall prepare a report upon the matters submitted to him by the order of reference and, if required to make findings of fact and conclusions of law, he shall set them forth in the report. *He shall file the report with the clerk of the court* and, unless otherwise directed by the order of reference, shall file with it a transcript of the proceeding and of the evidence in the original exhibits. *The clerk shall forthwith mail to all parties notice of the filing*.

(Emphasis added). Then Rule 53(g)(2) stipulates,

Within ten days *after being served with notice of the filing of the report* any party may serve written objections thereto upon the other parties. Application to the court for action upon the report and upon objections thereto shall be by motion and upon notice as provided by Rule 6(d).

(Emphasis added).

¶30.    The docket is devoid of any entry showing the special master's report was filed with the chancery court. Because the report was not filed with the court, the ten-day bar did not attach. *See Massey*, 475 So. 2d at 806 ("Appellant cannot now be heard to complain of procedural irregularities in . . . the report of the master, when appellant has, without objection, taken full advantage of all the benefits that were to be derived by both the litigants and the attorneys in . . . the chancery court of that county, derived from the services of the master").[11]

---

[11] "We caution attorneys, litigants and trial judges of this state to utilize Rule 53 in the future *with great care*." *Massey*, 475 So. 2d at 806 (emphasis added). This is especially true where, as here, the special master was not an attorney and, even more so, where the order of appointment did not direct him to file the report with the clerk. *See* MRCP 53(b). Due diligence should be exercised in instructing the special master to follow the dictates of Rule 53 requiring the special master to file the completed report specifically with the clerk of the court. "If the appointment is made under Rule 53, a master so appointed should *comply with great specificity with the requirements of that Rule*." *Massey*, 475 So. 2d at 806-07 (emphasis added).

**CONCLUSION**

¶31. The chancery court "accepted and approved" the special master's partition report after finding it was "not manifestly wrong," effectively adopting the report. After considering the proposed options and recommendations for partition from the special master, the court concluded that Option 1 was more equitable and ordered partition of the subject property accordingly. Finding no error, we affirm the chancery court's judgment.

¶32. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR.**